### BABY–TENDA CORPORATION, Appellant,

v.

### Stacey Marie HEDRICK and Division of Employment Security, Respondents.

### No. WD 59050.

Missouri Court of Appeals, Western District.

July 24, 2001.

---

Sharon Lehr, Kansas City, for Appellant.

Sharon Willis, Kansas City, for Respondent.

Stacey Marie Hedrick, Kansas City, pro se.

PAUL M. SPINDEN, Chief Judge.

Baby–Tenda Corporation appeals the Labor and Industrial Relations Commission's decision that Stacey Marie Hedrick was eligible for unemployment benefits. The commission concluded that Hedrick voluntarily quit her job with Baby–Tenda with good cause attributable to her work or to her employer. We affirm the commission's decision.

Hedrick worked for Baby–Tenda as a production worker for more than two years. On March 7, 2000, Hedrick's sister, who also worked for Baby–Tenda, told her that Baby–Tenda was having two of its employees remove insulation material from the plant and that she and other employees believed that the insulation contained asbestos. Her sister also told her that she and other employees had asked Leo Wynne, whom Hedrick described as the person who does machine repairs and makes sure that everything runs properly in the plant, about asbestos and that Wynne denied that any asbestos was in the

building. Hedrick's sister also told her that the employees had contacted the Occupational Safety and Health Administration and the Environmental Protection Agency concerning a possible claim against Baby–Tenda.

After hearing about the alleged asbestos removal, Hedrick went to the back of Baby–Tenda's warehouse, looked in six boxes in the storage area and found what appeared to be insulation in them. Later that day, while on a lunch break, Hedrick's sister telephoned the Kansas City Health Department, OSHA or the EPA to report the suspected asbestos removal. Hedrick's sister told Hedrick that someone at the contacted agency had told her to obtain a sample of the insulation material being removed. When Hedrick returned to work, she left her work station to go to where insulation had been removed from overhead pipes. She used a file to scrape residue from the pipes onto a piece of paper and gave the sample to her sister.[1]

During the remainder of the day on March 7, Hedrick was away from her work area again. The number and purpose of those absences were in dispute. During one of those absences, Baby–Tenda's president, David Jungerman, confronted her and asked her, "What the f___ are you looking for?"

The next morning, Hedrick telephoned Jungerman and told him that she would not be coming into work. Jungerman taped the conversation, and the tape and a transcript of it were introduced into evidence at the hearing. In their conversation, Hedrick told Jungerman:

> ... I don't know what you've got going on down there[,] but I don't deserve to be talked to the way you talked to me yesterday. I'm tired of being lied on. I don't know why you've got people running to you and telling you s___ that isn't happening. I made one extra trip to the bathroom with Madge because she has a drill in her locker that has a chuck key that fits the drill that I was using when I had to get a drill bit because those anchor bolt holes aren't deep enough[. A]nd rather than take them all over and redrill them, I just[,] you know[,] wanted to take that drill bit and drill out the ¼ inch that they're shy. She told me I could use her chuck key[,] but we had to go to the bathroom to do it because she wasn't bringing her drill out into the plant.
>
> . . .
>
> ... So I made one extra trip to the bathroom above normal yesterday. And I'm tired of being lied on. I'm tired of hearing th[at] people [are] out in the parking lot kicking on my car because they think I called OSHA. I didn't make those phone calls.[2] I'm tired of it. And then to have you come to me and ask me[,] "[W]hat the f___ I was looking for[.]" I mean I don't know what's going on and I don't deserve to be treated like this. Yeah[,] sure[,] my car's a piece of s___ [,] so it's not really hurting anything by having people kick on it, but I don't deserve that.
>
> . . .
>
> ... Yeah[,] well[,] if you'd stop the two-faced stuff down there, people talking to you and then running behind your back and telling lies on you, you might have a plant down there.
>
> . . .

---

**1.** Evidence at the hearing indicated that Occu–Tec, Inc., tested the sample and determined that it consisted of 25 percent chrysotile asbestos.

**2.** Previous telephone calls had been made to OSHA concerning claims unrelated to asbestos removal.

... But[,] I just[—] I don't deserve that. I come in there[—]you know[,] sure I don't come in on Mondays[—b]ut I come in four days a week and I work my ass off for you. I put out more work in four days than most of your people down there put out in six. Just like with Kenny building tables. Kenny was screwing off back there so bad he was building 30 tables a day. You know I could build 30 tables in 3 hours[, a]nd he was building you 30 tables a day. He's so busy leaving his area, running around[,] checking on what everybody else is doing that he's not getting any work done.

Later in the conversation, Jungerman told Hedrick that he was going to change her hours to a three-day shift instead of four. Hedrick responded:

No[,] I don't want to work three days a week. I was happy working four.

Jungerman: Well, we're gonna be working three days a week.

Hedrick: But I'm just[—]I'm not gonna come in at all.

Jungerman: What do you mean, you're not gonna come in at all?

Hedrick: I'm done with it[;] I'm done with the s___.

Jungerman: You're quitting?

Hedrick: Yeah, I'm done with it. I don't deserve to be talked to the way I was talked to yesterday.

Jungerman: Well, you weren't talked to any bad way at all[.]

Hedrick: You don't call that a bad way, when you say[,] "[W]hat the f___ were you looking for?"

Jungerman: Well, yeah, when you say that, that was[—]you were running around the plant all day, yeah, that's it—but you're quitting[. T]hat's that. We'll have your check for you.

Hedrick: All right.

Jungerman: All right, [']bye.

At the hearing, Hedrick testified that she told Jungerman that she quit because "there was just too much stuff going on there [that she] didn't want to be a part of, that there were too many people down there ... who were stabbing each other in the back every time you turn around and that ... [she] just didn't want to do it anymore." She said that she did not mention the asbestos to Jungerman because her sister told her that OSHA did not want to let out any more information than they had to because they did not want Baby-Tenda to try to cover up anything. Hedrick said that, when Jungerman told her that he was going to cut her schedule to three days, she told him, "... I don't want to work just three days a week.... I'm not going to work there at all." Hedrick testified at the hearing, however, that she quit her job because asbestos was being removed from the building and that she was fearful that her life and the lives of the people she went home to were in danger.

Hedrick applied for unemployment benefits on March 27, 2000. Division of Employment Security personnel initially determined that Hedrick was not qualified to receive unemployment benefits because she had quit her job voluntarily without good cause attributable to her work or to her employer. Hedrick appealed the decision to the division's appeals tribunal, which reversed the decision. The appeals tribunal concluded that Hedrick quit her job voluntarily with good cause attributable to her work or to her employer:

[Hedrick] quit her employment on March 8, 2000, after she learned that the employer was having some of its employees remove insulation material from the plant, which [Hedrick] believed contained asbestos material. The Appeals Tribunal finds that the workers were not

dismissed from work while this process was taking place. The employees were not warned or informed of the situation. The Appeals Tribunal finds that a laboratory analysis submitted by [Hedrick] indicated that some of these materials did contain asbestos.

Asbestos is potentially a dangerous substance.... The potential for harm to employees who may breathe such substances is great. This is especially so when it is being removed and possibly released into the air by individuals who were not professional asbestos removers. It is found that [Hedrick] had good cause for her concerns.

Baby–Tenda appealed this decision to the commission which adopted the appeals tribunal's decision as its own. Baby–Tenda appeals the commission's decision.

■ In a case in which an employee voluntarily quits his or her job, § 288.050.1(1), RSMo 2000, makes good cause a condition precedent to receiving immediate unemployment compensation benefits. The statute says:

Notwithstanding the other provisions of this law, a claimant shall be disqualified for ... benefits until after the claimant has earned wages for work insured pursuant to the unemployment compensation laws of any state equal to ten times the claimant's weekly benefit amount if the deputy finds:

(1) That the claimant has left work voluntarily without good cause attributable to such work or to the claimant's employer[.]

We construe this provision strictly and narrowly in favor of finding that an employee is entitled to compensation. *Sokol v. Labor and Industrial Relations Commission of Missouri,* 946 S.W.2d 20, 23 (Mo.App.1997). Whether an employee has good cause to leave her employment is a question of law, and we do not defer to the commission's determination on the matter. *Id.* at 26.

■ The Supreme Court has defined "good cause" as " 'cause that would motivate the average able-bodied and qualified worker in a similar situation to terminate his or her employment.' " *Hessler v. Labor and Industrial Relations Commission,* 851 S.W.2d 516, 518 (Mo. banc 1993) (quoting *Belle State Bank v. Industrial Commission, Division of Employment Security,* 547 S.W.2d 841, 846 (Mo.App.1977)). This is an objective standard. *Sokol,* 946 S.W.2d at 26. The circumstances that motivate an employee to quit voluntarily " 'must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical, and good faith is an essential element.' " *Hessler,* 851 S.W.2d at 518 (quoting *Belle,* 547 S.W.2d at 846). Good cause has two factors: reasonableness and good faith. *American Family Insurance Company v. Hilden,* 936 S.W.2d 207, 210 (Mo.App. 1996). Hedrick, therefore, had the burden of proving that her quitting was reasonable and done in good faith. *Hessler,* 851 S.W.2d at 518.

■ Whether Hedrick's quitting was reasonable depends upon whether her concerns were genuine and that any reasonable worker would have had these concerns. *Bunch v. Division of Employment Security,* 965 S.W.2d 874, 878 (Mo.App. 1998). As for good faith, an attempt to resolve the dispute with the employer before quitting is a strong indicator of good faith. *Id.; Wingo v. Pediatric and Adolescent Medical Consultants, Inc.,* 932 S.W.2d 898, 900 (Mo.App.1996). Such communication provides the employer with "an opportunity to correct or ameliorate conditions that the employer did not know about or did not know were a cause of concern to the employee." *Cooper v. Hy–Vee, Inc.,* 31 S.W.3d 497, 504 (Mo.App.

2000). Good faith, however, does not always require a complaint by the employee. *Id.* at 505 (employer was aware of previous complaints about hours and duties of the employee but had been unresponsive to those previous complaints).

■ Baby–Tenda asserts that Hedrick did not establish that a reasonable employee would be motivated to quit under these circumstances and that she acted in good faith. Baby Tenda asserts that Hedrick did not act in good faith because she did not attempt to share any of her concerns about possible asbestos exposure with Baby–Tenda before resorting to the drastic remedy of quitting her job. Hedrick admitted that she deliberately avoided telling Baby–Tenda about her concerns because some employees were interested in pursuing a complaint against Baby Tenda with OSHA and did not want to alert Baby–Tenda. Hedrick asserts that her failing to complain before quitting was not bad faith because she believed a hazardous condition existed and because any attempts to bring her concerns about asbestos to Baby–Tenda's attention would have been futile.

Hedrick testified that she quit because she believed that Baby–Tenda was removing asbestos illegally. She said that another employee had told her that Baby–Tenda had been removing the insulation for at least a week before she quit. Hedrick said that the employee told her that two of Baby–Tenda's employees were taking down the insulation, that they did nothing to enclose the room where they were taking it down, and that the insulation was being taken down after hours when the plant was closed. She said that Baby–Tenda did not give the employees notice about the insulation removal or give the employees an opportunity to decide whether or not they wanted to be at work during this time.

John Gilbertson, another Baby–Tenda employee, testified that he saw two employees taking down the insulation. He said that he had been trained at a previous job about asbestos removal and that the employees were not removing the insulation in the way that he had been trained to remove it. He said they were cutting the insulation down without wetting it and throwing it into boxes. He said that, according to his training, they should have put up plastic walls from the ceiling to the floor and sealed off the area. He said they also should have wrapped and soaked the insulation before removing it and should have put it in containers marked hazardous materials. Gilbertson testified that Baby Tenda also had employees scrape, patch and paint pipes in a bathroom where the insulation had been removed.

After learning of the other employees' suspicions about the asbestos removal, Hedrick testified that she investigated for herself and discovered that pipes in the plant had been stripped of the insulation and that six boxes of insulation were being stored in the back room. She also said, "[The removal of the insulation] was uncontained. There were asbestos particles all over, the dust and everything all over where they were just taking it down." She said that she had to use air hoses to blow off the particles that had fallen in her work area and that she saw white chunks of insulation in her work area. She also said that she could also see insulation particles floating through the air and that the particles got on her clothing. She said that when she came into work she noticed that several stacks of tables she had built had been moved out from underneath the overhead pipes. She also noticed that employees were spraying paint on the bathroom pipes and that the employees told her that she could not go in the bathroom. Hedrick said that she assumed that Baby–

Tenda was trying to cover up the pipes where asbestos was being removed.

Hedrick said that she believed that any discussion about the asbestos would have been futile because Wynne had denied to other employees that asbestos was being removed or that it was present in the workplace. Hedrick testified that Wynne was the person to whom Baby–Tenda supervisors told its employees to go to with their problems.

At the hearing, Hedrick presented material about the health risks associated with asbestos, and Baby–Tenda did not object to the introduction of this material into evidence. The material said that "no amount of asbestos has been proven to be safe" and that asbestos causes "asbestosis, mesothelioma, lung cancer and other cancers." According to the materials presented, very small amounts of asbestos cause mesothelioma and that asbestos workers' families have gotten mesothelioma from the dust the workers brought home on their clothing. Hedrick said that she did not want to wait until test results established whether asbestos was present because she "did not want to take the chance on staying there and being exposed to it."

Jungerman testified that he made the initial determination that the insulation did not contain asbestos. Jungerman said, "I made the initial look at that and made the determination—a very unprofessional determination that it was not asbestos, you know, because you can't tell unless you check the stuff. But to me it just looked like insulation so I said we're going to go with it." Jungerman acknowledged that subsequent tests by OSHA confirmed the presence of some asbestos in the building, but, he said, the Kansas City Health Department and a private asbestos testing consulting firm found no evidence of air contamination.

This evidence provided a sufficient basis for the commission's finding that Hedrick's concerns were genuine and that any reasonable worker would have had the same concerns. That Hedrick was not 100 percent certain that the material being removed was asbestos is not the overriding issue. Even Jungerman admitted that he was making an unprofessional determination about whether or not the material contained asbestos, and he acknowledged that the only way one can be sure is to test the material. The issue, therefore, is whether, given the information that Hedrick knew at the time that she quit, an average, able-bodied and qualified worker in a similar situation would have been motivated to quit. *Hessler*, 851 S.W.2d at 518.

When Hedrick learned of other employees' suspicions about asbestos, she did her own investigation to determine that insulation material was being taken down. Given Baby–Tenda's covert removal of the insulation material, a reasonable employee would have had concerns that it was trying to hide something from its employees. Baby–Tenda never provided notice to the employees about the insulation removal.

Moreover, an attempt by Hedrick to discuss her concerns with management before quitting surely would have been futile. Because Baby–Tenda was not open with its employees about removing the material, Hedrick's expectation that Baby–Tenda would not be responsive to her complaints was reasonable. Jungerman said that he made the decision that the material "just looked like insulation" and that he was "going to go with it." This suggests that Jungerman had initial concerns that the material might contain asbestos but did nothing to inform Baby–Tenda's employees.

Baby–Tenda asserts, however, that the reason that Hedrick quit was because of

personal reasons and not because of asbestos. In support of this contention Baby–Tenda relies on the telephone conversation that Hedrick had with Jungerman concerning her quitting.

In reviewing the commission's decision, we first determine whether substantial and competent evidence supports its decision, and, if it does, whether the decision is contrary to the overwhelming weight of the evidence. *Bunch*, 965 S.W.2d at 877. The commission is the fact finder. "Where the trier of fact has reached one of two possible conclusions from the evidence, this [c]ourt will not reach a contrary conclusion even if such a conclusion might have reasonably been reached." *Tin Man Enterprises, Inc. v. Labor and Industrial Relations Commission of Missouri*, 866 S.W.2d 147, 149 (Mo. App.1993).

The commission found that Hedrick quit her job because of her concerns about the illegal removal of asbestos. The record supported this finding. That the telephone conversation established another possible reason for Hedrick's quitting is of no consequence. We will not disturb the commission's finding when it is supported by the record. *Id.* at 150.

Hedrick explained that, when she telephoned Jungerman to quit, she did not tell him about the asbestos because her sister told her that OSHA did not want to let out any more information than they had to because they did not want Baby–Tenda to try to cover up anything. The commission believed Hedrick that she quit because of her concerns about asbestos. Although we might have made a different finding, we defer to the commission on issues of credibility. *Mitchell v. Division of Employment Security*, 922 S.W.2d 425, 427 (Mo.App.1996). The commission's decision was supported by substantial and competent evidence and was not contrary

to the overwhelming weight of the evidence.

Finally, Baby–Tenda complains that the commission's findings of fact are equivocal and that the facts as found by the commission do not support the award. We disagree. Section 288.200.1, RSMo 2000, requires that the commission "promptly notify the parties of its decisions and the reasons therefor." Pursuant to that obligation, the commission was required to make unequivocal, affirmative findings of the facts. *McClellan v. Brown Transfer and Storage Company*, 950 S.W.2d 704, 707 (Mo.App.1997). These finding of fact must provide for intelligent review of the decision, must reveal a reasonable basis for the decision, and must leave no room for doubt about which evidence the commission believed or rejected. *Garden View Care Center, Inc. v. Labor and Industrial Relations Commission of Missouri*, 848 S.W.2d 603, 607 (Mo.App.1993).

The commission found that Hedrick was concerned that Baby Tenda was removing insulation material containing asbestos. The commission also found that when Hedrick learned that Baby–Tenda was having its own employees remove the insulation materials while the employees were working at the plant and without notice to the employees, she quit her job. Moreover, although Hedrick may not have known about the specific medical risks associated with asbestos exposure, she testified that she quit her job because asbestos was being removed from the building and she feared that this endangered her and her family's lives.

The commission's findings provide for an intelligent review of the commission's decision. That the commission erroneously misstated where Hedrick retrieved the sample from to have tested and the num-

ber of boxes containing insulation material is of no consequence.[3] These errors are not prejudicial and do not change the outcome of the decision. Moreover, that the commission did not find whether or not the sample submitted for testing by Hedrick contained an "unsafe" amount of asbestos is also of no consequence. Again, to establish that she voluntarily quit with good cause, Hedrick's burden was to prove only that her quitting was reasonable and done in good faith. *Hessler*, 851 S.W.2d at 518. Hedrick met her burden, and the commission's findings support the award of unemployment benefits.

We affirm the commission's decision that Hedrick voluntarily quit her job with good cause attributable to her work or to her employer.

PATRICIA A. BRECKENRIDGE, Judge, and VICTOR C. HOWARD, Judge, concur.

---

3. The commission found that Hedrick obtained the sample for testing from one of the several boxes of material which the employees believed contained insulation. The record establishes that Hedrick obtained the sample for testing by using a file to scrape residue from the pipes onto a piece of paper. The commission also found that there were eight boxes of insulation, but the record established that there were six boxes.