

# In the
# Missouri Court of Appeals
## Western District

JAMES R. MARTIN,

        **Appellant,**

v.

**DIVISION OF EMPLOYMENT SECURITY,**

        **Respondent.**

**WD77207**

**OPINION FILED:**

**January 20, 2015**

## LABOR AND INDUSTRIAL RELATIONS COMMISSION

**Before Division Four: Alok Ahuja, C.J. Presiding,
James Edward Welsh, J., and Tracey Mason-White, Sp.J.**

James R. Martin appeals from the Labor and Industrial Relations Commission's determination that he is ineligible for unemployment benefits because he voluntarily quit his employment with Swift Transportation of Arizona without good cause attributable to his work or his employer. Martin contends that the record establishes that he had good cause for quitting his job and that the factual findings of the Commission are not supported by substantial and competent evidence. He also asserts that the Commission erred in denying unemployment compensation to him on the basis that he failed to provide expert testimony establishing that his headaches and eye strain were the result of the LED lights installed at his workplace. We affirm.

Martin worked for Swift Transportation as a diesel mechanic for approximately ten years. On July 13, 2013, Martin submitted his letter of resignation. In his letter of resignation, Martin stated that his decision to resign was "a direct result of the new extreme lighting recently installed in the shop work area." According to Martin, "the intense lighting cause[d him] to have headaches, overall eye fatigue, and adversely affect[ed his] driving at night." Martin's last day of work was July 27, 2013.

On July 31, 2013, Martin applied for unemployment benefits. On August 23, 2013, a deputy for the Missouri Division of Employment Security determined that Martin was disqualified from receiving unemployment benefits because he voluntarily quit his employment because he did not "take his concerns regarding the lighting to the highest authority prior to quitting." Martin appealed this determination to the division's appeals tribunal, and the appeals tribunal held a hearing.

The evidence at the hearing established that in mid-April, 2013, Swift Transportation had a new LED lighting system installed in the shop where Martin worked as a diesel mechanic. On April 19, 2013, Martin spoke to his immediate supervisor, Troy Binder, about the lights being too bright. On April 20, 2013, Martin told Binder that the lights were "just blinding" and were like looking into the sun. According to Martin, he began suffering from headaches and eye strain after Swift Transportation installed the new lighting system. On April 22, 2013, Binder issued Martin and another employee shaded safety glasses to wear while working under the lights. Before leaving work on April 22, Martin left Binder a note that said:

> These sun shades don't fit over my eye glasses properly--they rub my glass lens. Ear pieces also sit on top of my ears.

I am only asking for a reasonable accommodation with the extremely bright lights that we encounter here at night.

I don't feel issuing sun shades is the only solution.

If this is all you can do, please call me.

On April 23, 2013, Martin took FMLA leave to be with his sick mother in Texas. While in Texas, Martin telephoned Binder, and Binder told him that he was working on the lighting issue. Martin did not return to work until July 8, 2013. Upon his return to work, Binder told him that there was not anything he could do about the lights. Binder said that he had talked to the lighting engineers and that the engineers said that the lighting was adequate for "low bay lighting" and was "in spec." Martin suggested that Binder install one more wire to the switch box, which would allow half of the lights to be turned off. Binder told Martin that he did not know anything about the lights and did not know whether or not that could be done. Binder took no further action.

According to Martin, because his headaches and eye fatigue continued and because Swift Transportation made no changes to the lighting system, Martin tendered his two week notice on July 16, 2013, saying that he intended to resign. Martin did not submit any medical documentation to Swift Transportation. Martin's last day of work was July 27, 2013.

Martin admitted at the hearing that he had vision insurance and that he did not see an eye doctor about his eye issues and headaches. He also acknowledged that he never contacted OSHA about the lighting situation at Swift Transportation and never engaged a lighting specialist to determine if there was a problem with the lighting system. Martin said that he did not take his complaints beyond his immediate supervisor because he was always told to take his problems directly to his supervisor.

3

The appeals tribunal affirmed the deputy's decision. The appeals tribunal found that Martin was disqualified from receiving unemployment benefits because he "voluntarily left without an adequate good faith effort to resolve all concerns" and because "no expert evidence showed any medical issue existed and was connected to work." The appeals tribunal concluded that Martin did not meet his burden "to prove good cause to voluntarily leave attributable to the work or employer." Martin appealed this decision to the Commission. The Commission affirmed the appeals tribunal's decision and adopted the appeals tribunal's decision as its own. Martin appeals from the Commission's decision.

Appellate review of the Commission's decision in employment security matters is governed by section 288.210, RSMo 2000. We may modify, reverse, remand for rehearing, or set aside the Commission's decision on only these grounds: "(1) the Commission acted without or in excess of its power; (2) the award was procured by fraud; (3) the facts found by the Commission do not support the award; or (4) there was not sufficient, competent evidence in the record to warrant the making of the award." *Lewis v. Fort Zumwalt Sch. Dist.*, 260 S.W.3d 888, 889-90 (Mo. App. 2008) (citing § 288.210).

Martin contends that the record establishes that he had good cause for quitting his job and that the factual findings of the Commission are not supported by substantial and competent evidence. He also asserts that the Commission erred in denying unemployment compensation to him on the basis that he failed to provide expert testimony establishing that his headaches and eye strain were the result of the LED lights installed at his workplace.

Section 288.050.1(1), RSMo Cum. Supp. 2013, requires that, for an employee who has quit his job to qualify for unemployment compensation, his quitting must have been for good cause attributable to his work or his employer. "We construe this provision strictly and narrowly

4

in favor of finding that an employee is entitled to compensation." *Baby-Tenda Corp. v. Hedrick*, 50 S.W.3d 369, 374 (Mo. App. 2001).  Determining whether an employee has good cause to leave his employment is a question of law, and we do not defer to the commission's determination on issues of law.  *Id.*

As the claimant, Martin had the burden of proving good cause.  *Drake v. Lengel*, 403 S.W.3d 688, 690 (Mo. App. 2013).  "'Good cause' for purposes of determining eligibility for unemployment benefits has no fixed or precise meaning, and is judged by the facts of each case." *Quik 'N Tasty Foods, Inc. v. Div. of Emp't Sec.*, 17 S.W.3d 620, 626 (Mo. App. 2000).  "'[T]he circumstances motivating an employee to voluntarily terminate employment must be real, not imaginary, substantial, not trifling, and reasonable, not whimsical[.]'"  *Hessler v. Labor & Indus. Relations Comm'n*, 851 S.W.2d 516, 518 (Mo. banc 1993) (citation omitted).  "Good cause for voluntary unemployment is 'limited to instances where the unemployment is caused by external pressures so compelling that a reasonably prudent person would be justified in giving up employment.'"  *Reed v. Labor and Indus. Relations Comm'n of Missouri*, 664 S.W.2d 650, 652 (Mo. App. 1984).  "It is an objective measure based on what an average person would do acting reasonably and in good faith."  *Mauller v. Div. of Emp't Sec.*, 331 S.W.3d 714, 718 (Mo. App. 2011).  "With respect to the 'reasonableness' element, a claimant must demonstrate that the circumstances of the claimant's employment would cause a reasonable person to terminate the employment rather than continue working."  *Knobbe v. Artco Casket Co., Inc.*, 315 S.W.3d 735, 740 (Mo. App. 2010).  "The 'good faith' element requires the employee to 'prove an effort was made to resolve the dispute before resorting to the drastic remedy of quitting his or her job.'" *Drake*, 403 S.W.3d at 691.

According to Martin, the lighting at his job caused him to suffer headaches and eye strain. He claims that this constituted good cause to quit his job. "Ordinarily, '[i]f a claimant quits a job and seeks unemployment compensation benefits alleging medical reasons as good cause for quitting, such claimant must adduce expert medical evidence to prove a causal connection between the employee's work and the medical reason relied on.'" *Mena v. Cosentino Group, Inc.*, 233 S.W.3d 800, 804 (Mo. App. 2007) (quoting *Smith v. U.S. Postal Serv.*, 69 S.W.3d 926, 928 (Mo. App. 2002)). "'An exception to this rule exists where the causal connection is within the common knowledge or experience of a layperson.'" *Mena*, 233 S.W.3d at 804 (quoting *Smith,* 69 S.W.3d at 928).

Martin argues that cases requiring medical testimony are only applicable to cases involving mental or emotional injuries and workplace aggravation injuries and are not applicable to cases involving workplace injuries. *See Clevenger v. Labor & Indus. Relations Comm'n*, 600 S.W.2d 675, 676 (Mo. App. 1980) (claimant for unemployment benefits did not meet her burden of proof because she failed to produce competent medical evidence establishing a cause and effect relationship between her work and her complained of emotional and mental condition); *Mena*, 233 S.W.3d at 804 (claimant for unemployment benefits did not meet her burden of proof because she failed to produce evidence of medical causation linking the aggravation of her arthritis to her work); *Diversified Asphalt, Inc. v. Labor and Indus. Relations Comm'n of Mo.*, 622 S.W.2d 716, 719 (Mo. App. 1981) (claimant for unemployment benefits, who suffered from arthritis which she claimed was caused or aggravated by working conditions, did not meet her burden of proof because she failed to produce medical evidence establishing the cause and effect relationship between the complained-of condition and the asserted cause). We, however, find no such distinction. We fail to see how the need for medical testimony for a claim involving a

workplace injury is any different from a claim involving mental or emotional injuries or a claim involving workplace aggravation injuries. If medical causation is not within the common knowledge or experience of a layperson, "medical evidence establishing the cause and effect relationship between the complained-of condition and asserted cause" is necessary. *Clevenger*, 600 S.W.2d at 676. Thus, to the extent that Martin contends that medical testimony is only required for mental or emotional injuries and workplace aggravation injuries, his contention is without merit.

The Commission determined that Martin failed to meet his burden of proving that he voluntarily left his employment with Swift Transportation with good cause attributable to his work or his employer. In particular, the Commission concluded that Martin's alleged symptoms of headaches and eye strain due to the lighting conditions were not within a layperson's common knowledge or experience and that medical evidence was necessary to establish "the cause and effect relationship between the complained of condition and the asserted cause." *Clevenger*, 600 S.W.2d at 676. Indeed, the record in this case merely contains Martin's bare allegations that that the lights caused his symptoms,[1] but the record established that lighting engineers found that the lighting was adequate for "low bay lighting" and was "in spec." Martin offered no medical

---

[1]Martin also complains that he was denied the opportunity to introduce testimony from his co-worker, Charles Geyer, which Martin claims would have established a causal link between the lights and his symptoms. The co-worker's testimony, however, was properly excluded by the appeals tribunal because no expert testimony had been produced showing a link between the headaches and the lights. As noted above, because Martin's symptoms of headaches and eye strain due to the lighting conditions were not within a layperson's common knowledge or experience, medical evidence was necessary to establish "the cause and effect relationship between the complained of condition and the asserted cause." *Clevenger*, 600 S.W.2d at 676.

7

evidence establishing a medical connection between the lights at his job and his headaches and eye strain.[2]

An analogous case to the causation issue in this case is *Turner v. Norfolk Western Ry. Co.*, 785 S.W.2d 569 (Mo. App. 1990).[3]  In that case, a railroad employee filed an action for damages against railroad under the Federal Employers' Liability Act asserting that the defendant failed to provide a reasonably safe place to work.  Employee's complaint was that the railroad's roundhouse was noisy and as a result he suffered noise-induced hearing loss.  On appeal, the employee complained about the jury instruction because it submitted the defendant's constructive knowledge of the cause of the injury as an element of his claim for failure to provide safe conditions for work.  *Id*. at 572.  The court concluded:  "The noise level which may produce hearing loss is not a matter of common knowledge, therefore [the employee] had the burden of proof to show that in the exercise of due care [the railroad] should have known that the noise level in the North Kansas City roundhouse could cause hearing loss to employees working there."  *Id*. at 571.  The court stated, "Obviously some conditions which cause injury will be so apparent that it can only be said that the railroad knew or should have known of the condition. But there will be conditions of work which may produce injury which cannot be said to be so

---

[2]Martin asserts that requiring him to retain an expert, without providing him notice that he was required to do so until after his claim was denied, violates the public policy of this state contained in section 288.020.1, RSMo 2000.  That provision provides:  "Economic insecurity due to unemployment is a serious menace to health, morals, and welfare of the people of this state resulting in a public calamity."  Martin had the burden to establish that he had good cause for quitting his employment.  That he was not advised that he had to provide medical evidence establishing a medical connection between the lights at his job and his headaches and eye strain is not a violation of the public policy of this state.

[3]*But see Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 88 (2nd Cir. 2006) (holding that expert testimony is not needed to establish causation when "there if a generally understood causal connection between physical phenomena--in this case, very loud sounds, which we refer to colloquially as 'deafening'--and the alleged injury [hearing loss] that 'would be obvious to laymen.'"  *Tufariello*, however, "is the exception and not the norm for whether expert testimony establishing specific causation is necessary for cumulative trauma disorders."  *Myers v. Illinois Central R.R. Co*., 629 F.3d 639, 643 (7th Cir. 2010).

apparent as to impart notice to the railroad." *Id*. at 572. The court found that the central question is whether "the cause of the injury can be said to be commonly known as one that may cause the injury shown." *Id*. Because the employee failed to prove the level or duration of noise which may cause injury, the court found that it was necessary to include the additional paragraph on knowledge in the jury instruction. *Id*. The court stated: "While it may be said that it is a matter of common knowledge that loud noise may be harmful to hearing, it cannot be said that the dBA level which may cause injury to hearing is commonly known." *Id*.

In this case, we cannot say the causation of Martin's headaches and eye strain is "within common knowledge and experience so as to dispense with the necessity for some medical evidence." *Diversified Asphalt,* 622 S.W.2d at 719. "This is especially true where . . . no visible signs manifest themselves." *Id*.

Martin contends that, because he experienced a "sudden onset" of symptoms, causation could be inferred and expert evidence was unnecessary. In support of his contention, Martin relies on the "sudden onset doctrine." "That doctrine holds that causation may be inferred by a lay jury, without expert evidence, where the obvious symptoms of the injury follow the trauma immediately, or with only short delay, and the injury is the kind that is normally sustained in the kind of trauma being considered." *Berten v. Pierce*, 818 S.W.2d 685, 686 (Mo. App. 1991). "The lay jury by its common sense and experience may reliably find that the injury occurred as a result of the trauma." *Id*. This doctrine, however, typically applies in "'cases where the physical disability develops coincidentally with the negligent act, such as broken bones . . ., immediate, continuing back pain . . ., or an obvious wound.'" *Pruneau v. Smiljanich*, 585 S.W.2d 252, 255 (Mo. App. 1979) (quoting *De Moulin v. Kissir*, 446 S.W.2d 162, 165 (Mo. App. 1969)). The

9

doctrine is not applicable in this case where Martin claims that he suffers from headaches and eye strain due to lighting and not due to a physical trauma or an accident.

The Commission, therefore, did not err in finding that, because Martin failed to produce medical evidence, Martin failed to meet his burden of establishing that he had good cause for voluntarily quitting his employment with Swift Transportation.[4]  In so holding, we are not saying that in every case in which a claimant quits his or her job due to a medical reason that the claimant must produce expert medical evidence establishing a causal connection between the claimant's work and the medical reason relied on.  The claimant bears the burden of proving good cause and chooses the evidence to present to make his or her case concerning good cause.  But, if the causal connection between the claimant's work and the medical reason relied on is not within the common knowledge or experience of a layperson, a claim for unemployment compensation may be denied if the claimant chooses not to produce expert medical evidence.

We affirm the Commission's decision.[5]

/s/ JAMES EDWARD WELSH
James Edward Welsh, Judge

James Welsh, Judge, writes for the majority. Tracey Mason-White, Special Judge, concurs. Alok Ahuja, Chief Judge, writes a dissent.

---

[4]Because we reach this conclusion, we need not address Martin's remaining contentions on appeal.

[5]We express our appreciation to Dean Ellen Y. Suni, and student Brett M. Simon, of the Appellate Practice Clinic of the University of Missouri–Kansas City School of Law, who represented Martin in this appeal on a *pro bono* basis.



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

JAMES R. MARTIN,             )
                 Appellant,  )
                        )
v.                            )   WD77207
                        )
DIVISION OF EMPLOYMENT    )   **FILED:** January 20, 2015
SECURITY,                )
            Respondent.  )

### DISSENTING OPINION

Because I believe that the Commission misapplied the law in concluding that appellant James Martin did not have good cause for terminating his employment, I respectfully dissent.

Martin testified that he began suffering from headaches and eye strain after his employer installed a new LED lighting system in the maintenance shop in which he worked. He also testified that despite his repeated complaints and inquiries, his employer was unable or unwilling to resolve the issue. Martin then quit his employment.

The Labor and Industrial Relations Commission determined that Martin had failed to establish that he had "good cause attributable to the work" for voluntarily leaving his employment. § 288.050.1, RSMo. The Commission concluded (1) that Martin quit his job "without an adequate good faith effort to resolve all concerns"; and (2) that "no expert evidence showed any medical issue existed and was connected to work."

The majority affirms the Commission's decision based on the second rationale – that Martin was required to present expert testimony establishing a causal connection between his

headaches and eye strain and the lighting conditions at his workplace.  Unlike the majority, I do not believe that either of the Commission's stated reasons for denying Martin's claim can sustain its decision.  I would reverse the Commission's order and remand for further proceedings under a correct understanding of the applicable law.

1.	As the majority opinion notes, where an unemployment compensation claimant contends that a medical condition arising from employment constituted good cause for quitting, the claimant must generally present expert medical evidence to prove a causal connection between his work and the medical condition.  *See*, *e.g.*, *Mena v. Cosentino Grp., Inc.*, 233 S.W.3d 800, 804 (Mo. App. W.D. 2007).  Contrary to the majority, however, I do not believe this general rule applies here.

First, even outside the unemployment compensation context, the rule requiring expert medical testimony to establish causation applies only where "there is a sophisticated injury, one that requires surgical intervention or other highly scientific techniques for diagnosis."  *Wright v. Barr*, 62 S.W.3d 509, 524 (Mo. App. W.D. 2001) (medical malpractice case); *see also*, *e.g.*, *Pruett v. Federal Mogul Corp.*, 365 S.W.3d 296, 306 (Mo. App. S.D. 2012) (worker's compensation case).  On the other hand, expert testimony is unnecessary to establish causation "where the causal connection is within the common knowledge or experience of a layperson."  *Mena*, 233 S.W.3d at 804 (citation omitted).

Whether a particular causal connection must be substantiated by expert testimony is a question of law.  *Bock v. City of Columbia*, 274 S.W.3d 555, 562 (Mo. App. W.D. 2008).  Here, Martin complains that he suffered headaches and eye strain as a result of constant workplace exposure to high-intensity lighting.  This claim is not so sophisticated or complex as to trigger the expert-testimony requirement.  To the contrary, laypersons are generally aware that lighting

2

that is too intense, or not intense enough, may cause symptoms like those Martin experienced. Martin's claim that workplace lighting caused his complaints is similar to a claim that prolonged sitting produced back pain in a pregnant woman,[1] or that slipping while carrying a heavy load caused a herniated disc and back pain which intensified over the following week[2] – each of which was found to be within the realm of lay understanding.

*Turner v. Norfolk & Western Ry. Co.*, 785 S.W.2d 569 (Mo. App. W.D. 1990), on which the majority relies, is plainly distinguishable. In *Turner*, the circuit court instructed a jury in a noise-induced hearing loss case that the jury could only find the employer-defendant liable if the employer knew or reasonably should have known that the plaintiff's working conditions were "reasonably likely to cause substantial harm." *Id.* at 571. The jury returned a defense verdict. On appeal, the plaintiff argued that it should have been _presumed_ that his employer knew that the noise level in his workplace was harmful, and that it was erroneous to instruct the jury that it must _find_ such knowledge. The evidence at trial, however, indicated that the average noise level in the plaintiff's workplace was 78.7 decibels, but that "exposure to an eight-hour time-weighted average of less than 80 decibel (dBA) is not considered hazardous to hearing." *Id.* Thus, although the plaintiff argued that the employer exposed him to noise levels which were obviously hazardous, *the evidence* supported the opposite conclusion – that the noise level in his workplace was safe.

It is also significant that, in *Turner*, the plaintiff-employee was apparently exposed to the same noise levels for more than fifteen years before making a claim of work-related hearing loss. In contrast, in this case Martin's symptoms developed, and he complained of those symptoms,

---

[1] *Hernandez v. Staffing Solutions, Inc.*, 295 S.W.3d 564, 567 (Mo. App. E.D. 2009).
[2] *Eubanks v. Poindexter Mech., Plumbing & Heating*, 901 S.W.2d 246, 247, 249 (Mo. App. S.D. 1995).

immediately after a significant change in his working conditions: the installation of high-intensity LED lighting in the shop where he worked. Martin testified that the new lighting was "just blinding," "like you're looking into the sun." Martin's claim form, which was admitted into evidence at the hearing, states that Martin was sometimes required to work with his face within six feet of the lights, and that the lighting was uncomfortably bright even when he was working underneath a truck. Martin testified that he had not experienced headaches or eye fatigue prior to the lighting change, and that the symptoms disappeared when he was away from the workplace. Martin also testified that other employees complained of similar problems, although he was prevented by the appeals referee from offering the testimony of a co-worker concerning the co-worker's similar problems, with the statement that "you could present 50 people that had the same problem. I still need the expert testimony."

Under the "sudden onset" doctrine, "a causal connection may be inferred if the injury 'develops coincidentally with the negligent act.'" *State v. Norwood*, 8 S.W.3d 242, 247 (Mo. App. W.D. 1999) (quoting *Williams v. Jacobs*, 972 S.W.2d 334, 340 (Mo. App. W.D. 1998)). Where the doctrine applies, "it is not essential to have medical testimony"; instead, "a causal connection between an accident and injury can be inferred in cases where there is a visible injury, or a sudden onset of an injury, or 'an injury that as a matter of common knowledge follows the act.'" *Id.*

Given the evidence that Martin developed significant medical complaints immediately following a change in working conditions, that those complaints were shared by other workers, and that Martin had no pre-existing symptoms, the "sudden onset" doctrine supports the inference that Martin's symptoms were causally related to the new workplace lighting. While it may be that "the most obvious cases [in which the 'sudden onset' doctrine applies] are where a

4

person involved in an accident suffers a broken bone or open wound," *Norwood*, 8 S.W.3d at 248 (quoting *Tucker v. Wibbenmeyer*, 901 S.W.2d 350, 351 (Mo. App. E.D. 1995)), no case has limited the doctrine to visible physical injuries, and it has been applied outside that context. *See*, *e.g.*, *Pruneau v. Smiljanich*, 585 S.W.2d 252, 255–56 (Mo. App. E.D. 1979) (applying "sudden onset" doctrine where plaintiff testified that her headaches, back pain, visual impairment and nausea manifested themselves three to four days after an auto accident).

It is also significant that Martin is seeking unemployment benefits; he is not seeking to hold his employer liable for compensatory damages. Unlike a tort or worker's compensation action, the ultimate question is not whether the employer's actions proximately caused a compensable injury; instead, the ultimate issue under § 288.050.1(1) is whether Martin voluntarily quit his employment with "good cause" attributable to his work or his employer. As the majority acknowledges, the issue is whether Martin acted reasonably and in good faith; in other words, whether his working conditions "would cause a reasonable person to terminate the employment rather than continue working." *Knobbe v. Artco Casket Co.*, 315 S.W.3d 735, 740 (Mo. App. E.D. 2010).

I recognize that multiple Missouri cases have held that the necessity for expert medical causation testimony in unemployment compensation cases is judged by the same standards applicable in tort or workers' compensation cases. The application of the same proof standards in these two very different contexts seems difficult to justify. For example, it is easy to imagine circumstances in which a reasonable person would terminate their employment based on an unsubstantiated – but good-faith – belief that their employment was causing them physical harm. While such a good-faith belief might not be sufficient to support an award of compensatory damages against an employer, it should be sufficient to support a claim for unemployment

5

compensation. The legislature has instructed that the unemployment compensation statutes must be "liberally construed to accomplish th[e] purpose" of providing benefits to persons "unemployed through no fault of their own." § 288.020.2, RSMo. In particular, the voluntary-quit provision is to be construed "strictly and narrowly in favor of finding that an employee is entitled to compensation." *Baby-Tenda Corp. v. Hedrick*, 50 S.W.3d 369, 374 (Mo. App. W.D. 2001). Allowing compensation where an employee quits based on a good-faith belief that working conditions are harmful is consistent with the liberal construction we must apply to the unemployment compensation statutes, and the strict and narrow construction applied to disqualifying provisions.

Our decision in *Baby-Tenda* is instructive. In that case, an employee quit her employment based on her belief that the employer was removing asbestos-containing insulation materials at her workplace illegally, and in a manner that could endanger employees' health. Although the employee was not "100 percent certain" that the insulation material contained asbestos, we held that she acted reasonably in quitting. We explained:

> Th[e] evidence provided a sufficient basis for the commission's finding that Hedrick's concerns were genuine and that any reasonable worker would have had the same concerns. That Hedrick was not 100 percent certain that the material being removed was asbestos is not the overriding issue. Even [a supervisor] admitted that he was making an unprofessional determination about whether or not the material contained asbestos, and he acknowledged that the only way one can be sure is to test the material. The issue, therefore, is whether, given the information that Hedrick knew at the time that she quit, an average, able-bodied and qualified worker in a similar situation would have been motivated to quit.

> When Hedrick learned of other employees' suspicions about asbestos, she did her own investigation to determine that insulation material was being taken down. Given Baby-Tenda's covert removal of the insulation material, a reasonable employee would have had concerns that it was trying to hide something from its employees. Baby-Tenda never provided notice to the employees about the insulation removal.

6

*Id.* at 376 (citation omitted). Applying similar reasoning here, the evidence could support an award of benefits: even if Martin failed to present sufficient evidence to prove that the new lighting *actually* caused his headaches and eye strain, the evidence would support a finding that he had a substantial, good-faith basis for believing that to be the case, and that continued employment under such circumstances would be harmful to his health. This should be enough.[3]

Therefore, I would hold that Martin presented sufficient evidence to prove that he had good cause, attributable to his work and employer, for voluntarily quitting his employment, and that expert testimony on this issue was unnecessary. The credibility and weight of Martin's evidence remains to be determined, however. Because of his legal determination that expert testimony was necessary, the appeals referee did not separately address whether Martin's evidence was credible and persuasive concerning his working conditions, and the effect of those working conditions on his health. Because the referee did not address these factual questions, a remand would be necessary to allow the referee to decide them under appropriate legal standards.

2.      The evidence defeats the Commission's alternative rationale for denying Martin benefits: that he quit "without an adequate good faith effort to resolve all concerns." Contrary to the Commission's finding, Martin's supervisor acknowledged that Martin spoke to him multiple times about the problems the lighting was causing, and that Martin had suggested that the employer make a minor wiring modification to allow half of the lights in each fixture to be

---

[3]      I also note that, in its landmark decision in *Difatta-Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594, 598-99 (Mo. banc 2008), the Missouri Supreme Court held that an employee's departure from employment could not be considered "voluntary" if it was caused by a personal illness, even if that illness was not causally related to the employee's working conditions. This emphasizes, once again, that the decisive question in unemployment compensation cases is fundamentally different than the question presented in personal-injury-liability actions: in the unemployment context, the question is whether *the worker* was at fault in becoming unemployed, <u>not</u> whether *the employer* was at fault in causing the employee's injury or illness.

turned off. Martin's supervisor testified that he spoke with management employees in Arizona, who checked with the lighting company, but that there was nothing further the employer was able or willing to do to resolve Martin's concerns.

For his part, Martin testified that the shaded safety glasses his supervisor offered him did not fit, and did not resolve his problems with the lights. Martin also testified that he personally contacted the lighting manufacturer, was told that the lights were hung too low in his workplace, and was advised that a wiring change could allow half of the lights in each fixture to be turned off. Martin's claim form indicates that he spoke with a Wal-Mart maintenance employee, who told him that the wiring modification suggested by the manufacturer could be "easily done." Martin's administrative appeal form states that he spoke with a Human Resources employee from the company's Arizona headquarters concerning the lighting situation. In addition, it appears that one of Martin's co-workers discussed the lighting situation not only with the Human Resources department, but also with the Occupational Safety and Health Administration (OSHA) (although the co-worker's testimony was unfortunately cut short by the appeals referee). Despite these various complaints and inquiries by Martin and his co-worker, the company did nothing to alter the lighting situation.

Given the testimony of Martin's supervisor, the evidence established that Martin attempted, more than once, "to resolve the dispute before resorting to the drastic remedy of quitting his job," and gave Swift Transportation "an opportunity to correct or ameliorate [the] conditions" which Martin contended were making his work unsustainable. *Kimble v. Div. of Emp't Sec.*, 388 S.W.3d 634, 642 (Mo. App. W.D. 2013) (citations and internal quotation marks omitted). The Commission's alternative conclusion that Martin failed to act in good faith cannot support its order.

**Conclusion**

I would reverse the Commission's order, and remand the case to the Commission to make findings, based on the lay testimony, concerning whether Martin's working conditions had sufficiently severe effects on his health to cause a reasonable person to terminate their employment.

/s/ ALOK AHUJA
Alok Ahuja, Chief Judge

9