Alok Ahuja, Chief Judge,
dissenting.
Because I believe that the Commission misapplied the law in concluding that appellant James Martin did not have good cause for terminating his employment, I respectfully dissent. Martin testified that ■he began suffering from headaches and eye strain after his employer installed a new LED lighting system in the maintenance shop in which he worked. He also testified that despite his repeated complaints and inquiries, his employer was unable or unwilling to resolve the issue. Martin then'quit his employment.
The Labor and Industrial Relations Commission determined that Martin had failed to establish that he had “good cause attributable to the work” for voluntarily leaving his employment. § 288.050.1, RSMo. The Commission concluded (1) that Martin quit his job “without an adequate good faith effort to resolve all concerns”; and (2) that “no expert evidence showed any medical issue existed and was connected to work.”
The majority affirms the Commission’s decision based on the second rationale— that Martin was required to present expert testimony establishing a causal connection between his headaches and eye strain and the lighting conditions at his workplace. Unlike the majority, I do not believe that either of the Commission’s stated reasons for denying Martin’s claim can sustain its decision. I would reverse the Commission’s order and remand for further proceedings under a correct understanding of the applicable law.
1. As the majority opinion notes, where an unemployment compensation claimant contends that a medical condition arising from employment constituted good cause for quitting, the claimant must generally present expert medical evidence to prove a causal connection between his work and the medical condition. See, e.g., Mena v. Cosentino Grp., Inc., 238 S.W.3d 800, 804 (Mo.App.W.D.2007). Contrary to the majority, however, I do not believe this general rule applies here.
First, even outside the unemployment compensation context, the rule requiring expert medical testimony to establish causation applies only where “there is a sophisticated injury, one that requires surgi-' cal intervention or other highly scientific techniques for diagnosis.” Wright v. Barr, 62 S.W.3d 509, 524 (Mo.App.W.D.2001) (medical malpractice case); see also, e.g., Pruett v. Federal Mogul Corp., 365 S.W.3d 296, 306 (Mo.App.S.D.2012) (worker’s compensation case). On the other hand, expert testimony is unnecessary to establish causation “where the causal connection is within the common knowledge or experience of a layperson.” Mena, 233 S.W.3d at 804 (citation omitted).
Whether a particular causal connection must be substantiated by expert testimony is a quéstion of law. Bock v. City of Columbia, 274 S.W.3d 555, 562 (Mo.App.W.D.2008). Here, Martin complains that he suffered headaches and eye strain as a result of constant workplace exposure to high-intensity lighting. This claim is not so sophisticated or complex as to trigger the expert-testimony requirement. To the contrary, laypersons are generally aware that lighting that is too intense, or not intense enough, may cause symptoms like those Martin experienced. Martin’s claim that workplace lighting caused his complaints is similar to a claim that prolonged, sitting produced back pain in a pregnant *422 woman,[1] or that slipping while carrying a heavy load caused a herniated disc and back pain which intensified over the following week[2] — each of which was found to be within the realm of lay understanding.
Turner v. Norfolk & Western Ry. Co., 785 S.W.2d 569 (Mo.App.W.D.1990), on which the majority relies, is plainly distinguishable. In Turner, the circuit court instructed a jury in a noise-induced hearing loss case that the jury could only find the employer-defendant liable if the employer knew or reasonably should have known that the plaintiffs working conditions were “reasonably likely to cause substantial harm.” Id. at 571. The jury returned a defense verdict. On appeal, the plaintiff argued that it should have been presumed that his employer knew that the noise level in his workplace was harmful, and that it was erroneous to instruct the jury that it must find such knowledge. The evidence at trial, however, indicated that the average noise level in the plaintiffs workplace was 78.7 decibels, but that “exposure to an eight-hour time-weighted average of less than 80 decibel (dBA) is not considered hazardous to hearing.” Id. Thus, although the plaintiff argued that the employer exposed him to noise levels which were obviously hazardous, the evidence supported the opposite conclusion— that the noise level in his workplace was safe.
It is also significant that, in Turner, the plaintiff-employee was apparently exposed to the same noise levels for more than fifteen years before making a claim of work-related hearing loss. In contrast, in this case Martin’s symptoms developed, and he complained of those symptoms, immediately after a significánt change in his working conditions: the installation of high-intensity LED lighting in the shop where he worked. Martin testified that the new lighting was “just blinding,” “like you’re looking into the sun.” Martin’s claim form, which was admitted into evidence at the hearing, states that Martin was sometimes required to work with his face within six feet of the lights, and that the lighting was uncomfortably bright even when he was working underneath a truck. Martin testified that he had not experienced headaches or eye fatigue prior to the lighting change, and that the symptoms disappeared when he was away from the workplace. Martin also testified that other employees complained of similar problems, although he was prevented by the appeals referee from offering the testimony of a co-worker concerning the coworker’s similar problems, with the statement that “you could present 50 people that had the same problem. I still need the expert testimony.”
Under the “sudden onset” doctrine, “a causal connection may be inferred if the injury ‘develops coincidentally with the negligent act.’ ” State v. Norwood, 8 S.W.3d 242, 247 (Mo.App.W.D.1999) (quoting Williams v. Jacobs, 972 S.W.2d 834, 340 (Mo.App.W.D.1998)). Where the doctrine applies, “it is not essential to have medical testimony”; instead, “a causal connection between an accident and injury can be inferred in cases where there is a visible injury, or a sudden onset of an injury, or ‘an injury that as a matter of common knowledge follows the act.’ ” Id.
Given the evidence that Martin developed significant medical complaints immediately following a change in working conditions, that those complaints were shared by other workers, and that Martin had no *423 pre-existing symptoms, the “sudden onset” doctrine supports the inference that Martin’s symptoms were causally related to the new workplace lighting. While it may be that “the most obvious cases [in which the ‘sudden onset’ doctrine applies] are where a person involved in an accident suffers a broken bone or open wound,” Norwood, 8 S.W.3d at 248 (quoting Tucker v. Wibbenmeyer, 901 S.W.2d 350, 351 (Mo.App.E.D.1995)), no case has limited the doctrine to visible physical injuries, and it has been applied outside that context. See, e.g., Pruneau v. Smiljanich, 585 S.W.2d 252, 255-56 (Mo.App.E.D.1979) (applying “sudden onset” doctrine where plaintiff testified that her headaches, back pain, visual impairment and nausea manifested themselves three to four days after an auto accident).
It is also significant that Martin is seeking unemployment benefits; he is not seeking to hold his employer liable for compensatory damages. Unlike a tort or worker’s compensation action, the ultimate question is not whether the employer’s actions proximately caused a compensable injury; instead, the ultimate issue under § 288.050.1(1) is whether Martin voluntarily quit his employment with “good cause” attributable to his work or his employer. As the majority acknowledges, the issue is whether Martin acted reasonably and in good faith; in other words, whether his working conditions “would cause a reasonable person to terminate the employment rather than continue working.” Knobbe v. Artco Casket Co., 315 S.W.3d 735, 740 (Mo.App.E.D.2010).
I recognize that multiple Missouri cases have held that the necessity for expert medical causation testimony in unemployment compensation cases is judged by the same standards applicable in tort or workers’ compensation cases. The application of the same proof standards in these two very different contexts seems difficult to justify. For example, it is easy to imagine circumstances in which a reasonable person would terminate their employment based on an unsubstantiated — but good-faith — belief that their employment was causing them physical harm. While such a good-faith belief might not be sufficient to support an award of compensatory damages against an employer, it should be sufficient to support a claim for unemployment compensation. The legislature has instructed that the unemployment compensation statutes must be “liberally construed to accomplish th[e] purpose” of providing benefits to persons “unemployed through no fault of their own.” § 288.020.2, RSMo. In particular, the voluntary-quit provision is to be construed “strictly and narrowly in favor of finding that an employee is entitled to compensation.” Baby-Tenda Corp. v. Hedrick, 50 S.W.3d 369, 374 (Mo.App.W.D.2001). Allowing compensation where an employee quits based on a good-faith belief that working conditions are harmful is consistent with the liberal construction we must apply to the unemployment compensation statutes, and the strict and narrow construction applied to disqualifying provisions.
Our decision in Baby-Tenda is instructive. In that case, an employee quit her employment based on her belief that the employer was removing asbestos-containing insulation materials at her workplace illegally, and in a manner that could endanger employees’ health. Although the employee was not “100 percent certain” that the insulation material contained asbestos, we held that she acted reasonably in quitting. We explained:
Th[e] evidence provided a sufficient basis for the commission’s finding that Hedrick’s concerns were genuine and that any reasonable worker would have had the same concerns. That Hedrick *424 was not 10Ó percent certain that the material being removed was asbestos is not the overriding issue. Even [a supervisor] admitted that he was making an unprofessional determination about whether or not the material contained asbestos, and he acknowledged that the only way one1 can be sure is to test the material. The issue, therefore, is whether, given the information that Hedrick knew at the time thát she quit, an average, able-bodied and qualified worker in a similar situation would have been motivated to quit.
When Hedrick learned of other employees’ suspicions about asbestos, she did her own investigation to determine that insulation material was being taken down. Given Baby-Tenda’s covert removal of the insulation material, a reasonable employee would have had concerns that it was trying to hide something from its employees. Baby-Tenda never provided notice to the employees about the insulation removal.
Id. at 376 (citation omitted). Applying similar reasoning here, the evidence could support an award of benefits: even if Martin failed to present sufficient evidence to prove that the new lighting actually caused his headaches and eye strain, the evidence would support a finding that he had a substantial, good-faith basis for believing that to be the case, and that continued employment under such circumstances would be harmful to his health. This should be enough.[3]
Therefore, I would hold that Martin presented sufficient evidence to prove that he had good cause, attributable to his work and employer, for voluntarily quitting his employment, and that expert testimony on this issue was unnecessary. The credibility and weight of Martin’s evidence remains to be determined, however. Because of his legal determination that expert testimony was necessary, the appeals referee did not separately address whether Martin’s evidence was credible and persuasive concerning his working conditions, and the effect of those working conditions on his health. Because the referee did not address these factual questions, a remand would be necessary to allow the referee to decide them under appropriate legal standards.
2. The evidence defeats the Commission’s alternative rationale for denying Martin benefits: that he quit “without an adequate good faith effort to resolve all concerns.” Contrary to the Commission’s finding, Martin’s supervisor acknowledged that Martin spoke to him multiple times about the problems the lighting was causing, and that Martin had suggested that the employer make a minor wiring modification to allow half of the lights in each fixture to be turned off. Martin’s supervisor testified that he spoke with management employees in Arizona, who checked with the lighting company, but that there was nothing further the employer was able or willing to do to resolve Martin’s con1 cerns.
*425 For his part, Martin testified that the shaded safety glasses his supervisor offered him did not fit, and did not resolve his problems with the lights. Martin also testified that he personally contacted the lighting manufacturer, was told that the lights were hung too low in his workplace, and was advised that a wiring change could allow half of the lights in each fixture to be turned off. Martin’s claim form indicates that he spoke with a Wal-Mart maintenance employee, who told him that the wiring modification suggested by the manufacturer could be “easily done.” Martin’s administrative appeal form states that he spoke with a Human Resources employee from the company’s Arizona headquarters concerning the lighting situation. In addition, it appears that one of Martin’s co-workers discussed the lighting situation not only with the Human Resources department, but also with the Occupational Safety and Health Administration (OSHA) (although the co-worker’s testimony was unfortunately cut short by the appeals referee). Despite these various complaints and inquiries by Martin and his co-worker, the company did nothing to alter the lighting situation.
Given the testimony of Martin’s supervisor, the evidence established that Martin attempted, more than once, “to resolve the dispute before resorting to the drastic remedy of quitting his job,” and gave Swift Transportation “an opportunity to correct or ameliorate [the] conditions” which Martin contended were making his work unsustainable. Kimble v. Div. of Emp’t Sec., 388 S.W.3d 634, 642 (Mo.App.W.D.2013) (citations and internal quotation marks omitted). The Commission’s alternative conclusion that Martin failed to act in good faith cannot support its order.
Conclusion
I would reverse the Commission’s order, and remand the case to the Commission to make findings, based on the lay testimony, concerning whether Martin’s working conditions had sufficiently severe effects on his health to cause a reasonable person to terminate their employment.

. Hernandez v. Staffing Solutions, Inc., 295 S.W.3d 564, 567 (Mo.App.E.D.2009).

. Eubanks v. Poindexter Mech., Plumbing & Heating, 901 S.W.2d 246, 247, 249 (Mo.App.S.D.1995).

. I also note that, in its landmark decision in Difatta-Wheaton v. Dolphin Capital Corp., 271 S.W.3d 594, 598-99 (Mo. banc 2008), the Missouri Supreme Court held that an employee's departure from employment could not be considered “voluntary” if it was caused by a personal illness, even if that illness was not causally related to the employee's working conditions. This emphasizes, once again, that the decisive question in unemployment compensation cases is fundamentally different than the question presented in personal-injury-liability actions: in the unemployment context, the question is whether the worker was at fault in becoming unemployed, not whether the employer was at fault in causing the employee’s injury or illness.